**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION AT DAYTON**

| | | |
|---|---|---|
| MAGGIE RACZ, | : | Case No. 3:15-cv-74 |
| | : | |
| Plaintiff, | : | District Judge Walter Herbert Rice |
| | : | |
| vs. | : | Chief Magistrate Judge Sharon L. Ovington |
| | : | |
| COMMISSIONER OF SOCIAL | : | |
| SECURITY, | : | |
| | : | |
| Defendant. | : | |

---

# REPORT AND RECOMMENDATION[1]

---

This Social Security disability benefits appeal is before the Court on Plaintiff's statement of errors (Doc. 8), the Commissioner's memorandum in opposition (Doc. 11), the Plaintiff's reply (Doc. 12), the administrative record (Doc. 6), and the record as a whole.  At issue is whether the Administrative Law Judge ("ALJ") erred in finding Plaintiff "not disabled" and therefore not entitled to a period of disability and disability insurance benefits ("DIB"), nor Supplemental Security Income ("SSI").  (*See* Doc. 6, PageID ## 75-88 (the "ALJ's decision")).

## I.  INTRODUCTION

Plaintiff Maggie Racz protectively filed an application for a period of disability and DIB on August 5, 2011, alleging disability beginning on May 3, 1993.  (Doc. 6,

---

[1] Attached is a NOTICE to the parties regarding objections to this Report and Recommendation.

PageID # 217).[2]  Subsequently, on August 26, 2011, Plaintiff filed an application for SSI, alleging an onset date of April 1, 2008.  (*Id.* at 224).  Plaintiff stated she was unable to work due to diabetes and depression.  (*Id.* at 254).  Her claim was denied initially and on reconsideration.  (*Id*. at 75).

Plaintiff requested a hearing before an ALJ, which was held on July 18, 2013.  (*Id.* at 75).  Plaintiff and a vocational expert ("VE") testified, with Plaintiff's counsel in attendance.  (*Id.*)

On September 12, 2013, ALJ David A. Redmond issued an unfavorable decision, finding that Plaintiff had not been under a disability as defined in the Social Security Act, and was therefore not entitled to a period of disability, DIB, and SSI.  (*Id.* at 88).[3]  The ALJ found that Plaintiff had the residual functional capacity ("RFC")[4] to perform light work with certain limitations.  (*Id.* at 79).  Based on Plaintiff's age, education, work experience, and RFC, the ALJ found that there were a significant number of jobs in the national economy that Plaintiff could perform.  (*Id.* at 87).  Therefore, the ALJ concluded that Plaintiff was not disabled.  (*Id.* at 90).

The decision became final and appealable on January 21, 2015, when the Appeals Council denied Plaintiff's request for review.  (*Id*. at 56-58).  Plaintiff then properly

---

[2] Plaintiff filed her applications with the Social Security Administration under the name Magdelene Ann Racz.

[3] The ALJ considered Plaintiff's disability onset date to be May 3, 1993, in order to give Plaintiff "the full benefit of the doubt."  (Doc. 6, PageID # 75).

[4] A claimant's RFC is an assessment of "the most [she] can still do despite [her] limitations." 20 C.F.R. § 404.1545(a)(1).

commenced this action in federal court for judicial review of the Commissioner's decision pursuant to 42 U.S.C. §§ 405(g).

At the time of the hearing, Plaintiff was 44 years old. (Doc. 6, PageID # 86). She completed high school in 1987, but had no specialized job training, and had not attended any trade or vocational schools. (*Id.* at 254-55). The VE testified at the hearing that Plaintiff may not have engaged in full-time work since 1998, at which time she was employed as an accounting clerk. (*Id.* at 105).[5] Ultimately, however, the ALJ made no determination regarding Plaintiff's past relevant work due to insufficient vocational information. (*Id.* at 86).

The ALJ's "Findings," which represent the rationale of his decision, are as follows:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2004, but not thereafter.

2. The claimant has not engaged in substantial gainful activity since May 3, 1993, the alleged disability onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3. The claimant has the following severe impairments: insulin-dependent diabetes mellitus, major depressive disorder, and post-traumatic stress disorder (PTSD) (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

_____

[5] Pursuant to 20 C.F.R. § 404.1560(b)(1), "past relevant work" is defined as "work that [the claimant] ha[s] done within the past 15 years, that was substantial gainful activity, and that lasted long enough for [the claimant] to learn to do it."

5. After careful consideration of the entire record … the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) with the following limitations: unskilled work featuring no more than occasional personal contacts in the workplace and no production quotas.

6. The [ALJ] makes no finding regarding past relevant work (20 CFR 404.1520(h) and 416.920(h)).

7. The claimant was born on May 27, 1969, and was 23 years old, which defined her as a younger individual, age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from May 3, 1993, through the date of [the ALJ's] decision (20 CFR 404.1520(g) and 416.920(g)).

(Doc. 6, PageID ## 77-88).  In sum, the ALJ concluded that Plaintiff was not under a disability as defined by the Social Security Act and was therefore not entitled to a period of disability and DIB, or SSI.  (*Id.* at 88).

On appeal, Plaintiff argues that the ALJ failed to give appropriate weight to the treating source, as required under the Social Security Administration's own rulings and regulations, as well as Sixth Circuit case law.  (Doc. 8).

4

## II.  STANDARD OF REVIEW

The Court's inquiry on appeal is limited to whether the ALJ's non-disability finding is supported by substantial evidence and whether the correct legal standard was applied.  42 U.S.C. § 405(g); *Kyle v. Comm'r of Soc. Sec.*, 609 F.3d 847, 854 (6th Cir. 2010).  Substantial evidence is more than a "mere scintilla" but less than a preponderance of the evidence.  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion").

In reviewing the ALJ's decision, the district court must look to the record as a whole and may not base its decision on one piece of evidence while disregarding all other relevant evidence.  *Hephner v. Mathews*, 574 F.2d 359, 362 (6th Cir. 1978).  Even if the district court "might have reached a contrary conclusion of fact, the [ALJ's] decision must be affirmed so long as it is supported by substantial evidence."  *Kyle*, 609 F.3d at 854-855 (citing *Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 604-05 (6th Cir. 2009)).

The claimant bears the ultimate burden to prove by sufficient evidence that she is entitled to disability benefits.  20 C.F.R. § 404.1512(a).  That is, she must present sufficient evidence to show that, during the relevant time period, she was unable to engage in substantial gainful activity by reason of any medically determinable physical or mental impairment, or combination of impairments, which has lasted or is expected to last for a continuous period of at least twelve months.  42 U.S.C. § 423(d)(1)(A).

### III.  BACKGROUND

The relevant facts, as reflected in the record, are as follow:[6]

#### A.  Relevant Medical Evidence

##### 1.  *Physical Impairments*

Plaintiff's primary physical impairment is type I diabetes, which appears to be negatively affected when Plaintiff is under stress, not maintaining a healthy diet, and not consistently taking her medication.  (Doc. 8 at 2-6).  Plaintiff also fractured her right hand, requiring surgery.  (*Id.* at 2).

##### 2.  *Mental Impairments*

###### a.  Sarah Kramer, LISW-S[7]

Sarah Kramer, LISW-S, began seeing Plaintiff and Plaintiff's fiancé for one-hour counseling sessions on a weekly to bi-weekly basis beginning April 2012.[8]  (Doc. 6, PageID # 781).  Ms. Kramer's progress notes from Plaintiff's first session, dated April

---

[6] Having thoroughly reviewed the administrative record, the Court finds that a detailed recitation of all facts in this case is unnecessary and, therefore, restricts its statement of the facts to those relevant to Plaintiff's alleged errors.

[7] LISW stands for "Licensed Independent Social Worker," and the "-S" specifies a supervisory designation.  National Association of Social Workers, NASW Ohio Chapter Supervision Registry, available at: http://www.naswoh.org/?397

[8] Notably, Ms. Kramer utilized a standard "Individual Progress Notes" form to document each of Plaintiff's sessions.  As a result, Ms. Kramer's notes are responsive to the same set of inquiries following every session.  Therefore, Plaintiff's progress, as well as patterns and inconsistencies are more easily detected on review.  (Doc. 6, PageID ## 700-56, 781-83, 793-806).

18, 2012, state "Cl[ient] and fiancé are here for <u>couples behavioral health counseling</u>" (*id.* at 744), having been referred by Marriage Works! Ohio (*id.* at 745).[9]  (Emphasis added).

Ms. Kramer's April 18 progress notes indicate that Plaintiff described herself as "outspoken, organized, funny, active, good cook, and most of all, a good mother."  (*Id.* at 746).  Further, Plaintiff told Ms. Kramer that she no longer suffers from depression anymore since she has been on her medication.  (*Id.* at 750).  Ms. Kramer also completed a Mental Status Exam form, which provides for an assessment of various listed signs and symptoms, and instructs that the level of abnormal findings are to be rated on a scale of 1 to 3.[10]  (*Id.* at 756).  Ms. Kramer largely noted normal findings in all areas, such as well-groomed appearance, logical thought process, cooperative behavior, and average intelligence.  (*Id.*)  However, Ms. Kramer's notes indicate the following abnormal findings: withdrawn (2), slowed activity (1), pressured and soft-spoken speech (1), guilty thoughts (1), depressed mood (2), flat affect (2), withdrawn behavior (2), and loss of interest (2).[11]  (*Id.*)  Ms. Kramer noted that Plaintiff did not report any level of "self-abuse," including suicidal thoughts.  (*Id.* at 756).

---

[9] While Plaintiff is identified as the "client" and is largely the focus of the counseling, the sessions are tailored as 'couples counseling' services, based on both the referral from Marriage Works! Ohio and at Plaintiff's express request.  (Doc. 6, PageID ## 745, 753).  Further, the progress notes indicate that Plaintiff's fiancé was present and actively participating in all but a few of the sessions.  (*Id.* at 700-56, 793-806).

[10] The form instructs as follows: "Record level of care next to abnormal findings.  1 = Mild, 2 = Moderate, 3 = Severe, X = Normal Findings."  (Doc. 6, PageID # 756).

[11] The parenthetical number following the abnormal finding reflects the score Ms. Kramer assigned to each.

On July 9, 2012, Ms. Kramer's notes indicate for the first time that Plaintiff expressed suicidal ideations.  (*Id.* at 728).  She wrote that Plaintiff told her she "is having fleeting suicidal thoughts but would not go through with it."  (*Id.*)  However, at the next session on July 23, 2012, Ms. Kramer's notes indicate that Plaintiff expressly denied suicidal ideations.  (*Id.* at 723).  Notably, Ms. Kramer's July 9 progress note is the only one that indicates Plaintiff expressing suicidal ideations.  (*Id.* at 700-56, 793-806).  Ms. Kramer's last progress note, dated June 11, 2013, notes that Plaintiff was neither a danger to herself or others, that her depression was rated at a six out of ten (as it had been since April 24, 2013), that her primary concerns appeared to be the health of her fiancé and children, and that "she has no more 'bottoming out' of sugar since food stamps."  (*Id.* at 794).  Overall, the progress notes appear to show that Plaintiff's mood fluctuations and physical health issues were largely the result of poor diet and inconsistent use of medication.

On February 12, 2013, Ms. Kramer completed a Mental Impairment Questionnaire in which she described Plaintiff's sessions as "[b]ehavioral health counseling services; [p]sycho-educational; pharmacological services."  (*Id.* at 781-83).[12]  In identifying Plaintiff's signs and symptoms, Ms. Kramer checked off the following: poor memory, sleep disturbance, personality change, mood disturbances, emotional lability, recurrent panic attacks, anhedonia or pervasive loss of interests, feelings of guilt/worthlessness, difficulty thinking or concentrating, social withdrawal or isolation, illogical thinking or

---

[12] The Questionnaire was completed and signed by Ms. Kramer only.  The signature line for psychiatrist, Kenneth Glass, M.D., is left blank.  (Doc. 6, PageID # 783).

loosening of associations, decreased energy, manic syndrome, obsessive or compulsions, generalized persistent anxiety, hostility and irritability, and suicidal ideation or attempts. (*Id.* at 781-82).  Notably, Ms. Kramer did not check either substance dependence or blunt, flat, or inappropriate affect.  (*Id.* at 781).  Ms. Kramer also indicated that Plaintiff's Global Assessment of Functioning ("GAF") score at that time was 45, and noted that 45 was Plaintiff's highest GAF score over the past year.[13]  (*Id.*)

Ms. Kramer believed that Plaintiff's impairments were expected to last at least twelve months and that her mental health conditions were exacerbated by her "diabetic sugar levels, appetite, and activity levels."  (*Id.* at 782).  As to Plaintiff's prognosis, Ms. Kramer provided the following statement: "Consistent w/o resources for medication[.] With medication that does not interfere with diabetes and diabetes maintained/monitored [and] proper diet- mental capabilities <u>may</u> improve over time."  (*Id.*) (Emphasis in original).  Further, Ms. Kramer opined that Plaintiff's impairments or treatment would cause absences from work more than three times per month.  (*Id.* at 783).  Finally, Ms. Kramer indicated the following functional limitations resulting from Plaintiff's mental impairments: "slight" restrictions of activities of daily living; "marked" deficiencies of concentration, persistence, or pace; "marked" episodes of deterioration or

---

[13] A GAF score is used to report a clinician's judgment as to a patient's overall level of psychological, social, and occupational functioning.  <u>DSM-IV-TR Classification Appendix</u>, available at:  http://wps.prenhall.com/wps/media/objects/219/225111/CD_DSMIV.pdf.  The GAF scale ranges from 0 to 100, divided into ten-point increments, with a lower score indicating greater symptom severity and difficulty functioning.  *Id.*  A GAF score between 41 and 50 reflects: "Serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."  *Id.*

decompensation in work; and "marked" to "extreme" difficulties in maintaining social

functioning.  (*Id.*)

Significantly, when asked on the Questionnaire to "[d]escribe the clinical findings

including results of mental status examination which demonstrate the severity of

[Plaintiff's] mental impairments and symptoms," Ms. Kramer provided no information,

leaving the section entirely blank.  (*Id.*)

b.  Jerry E. Flexman, Ph.D.

On June 19, 2012, clinical neuropsychologist, Jerry E. Flexman, Ph.D., evaluated

Plaintiff, and subsequently provided a written assessment, at the State agency's request.

(Doc. 6, PageID ## 667-72).  Dr. Flexman noted that Plaintiff reports suffering from

diabetes and stating that her blood sugar fluctuates when she is under stress.  (*Id.* at 667).

Moreover, he noted that Plaintiff reports she was diagnosed with bipolar disorder, but

that a Bipolar Questionnaire was negative.  (*Id.*).

Plaintiff reported two prior psychiatric hospitalizations, the last of which she

claimed was in 2012 due to suicidal thoughts.  (*Id.* at 668).  Plaintiff also stated that she

had been arrested once for domestic violence.[14]  (*Id.*)  Plaintiff reported that she had a

history of alcohol abuse, but that she stopped drinking a year ago.  (*Id.*)  Plaintiff

admitted that she smoked marijuana four years prior, and that she still smokes cigarettes.

(*Id.*).

---

[14] It would appear that Plaintiff did not disclose to Dr. Flexman her prior conviction in federal
court for driving under the influence near Wright-Patterson Air Force Base, resulting in a
sentence of probation, which expired in 2011.  (*See* Doc. 8 at 4).

Plaintiff stated that her last job was working for Frisch's Restaurant as a waitress in 2009, but that she quit after three months.  (*Id*.)  Plaintiff specifically reported that she "got along well with coworkers and supervisors."  (*Id*.)

Dr. Flexman also summarized Plaintiff's self-report of her activities of daily living over the past year, as follows:

> [Plaintiff] is able to take care of all activities of daily living on her own. When [Plaintiff] needs to go someplace she drives, takes the bus, walks or rides a bike.  She prepares her food throughout the day.  She does the laundry, dishes, vacuuming, sweeping, cleaning and general straightening up around the house.  Outside chores are not required.  She goes to the store one or two times a week.  Activities include computers, festivals, carnivals, sports activities, boating, children's activities, games, parks, garage sales and thrift stores.  She does belong to a church.  She enjoys going out to eat, to movies, on dates and to the library.  She enjoys the computer and puzzles for hobbies.  She watches TV, listens to the radio and plays computer games.  She visits and talks with her friends.  She visits and talks with her children, parents, siblings and in-laws.  She does baby-sit her own children. She talks on the phone with friends and family.  She reads information on the computer and books. She handles her own finances and does no volunteer work.
>
> Appetite is fair but variable, she is well nourished and weight is stable.
>
> She goes to bed around 10:00 and wakes up at 5:00 with her boyfriend, and she goes back to bed until 8:00.  She sometimes naps and sometimes feels fatigued during the day.  She reports her sleep is good but variable.

(*Id.* at 668-69).

Dr. Flexman wrote that Plaintiff's appearance, facial expressions, movement, energy level, speech, comprehension, logic, and coherence were all normal and appropriate.  (*Id.* at 669).  He also noted that Plaintiff's affect was appropriate; lability was not present; attitude was flat but within normal limits; feelings of helplessness, hopelessness, and worthlessness were not present; anhedonic attitude was not present;

and signs of anxiety were not present.  (*Id.*)  Further, he stated that Plaintiff reported, "emotionally her mood is good when on meds," and that her temper is controlled.  (*Id.*)  Plaintiff denied fears, panic attacks, or phobias, and did not report having mood swings.  (*Id.*)

Plaintiff reported a past suicide attempt in 2012 when she cut herself and put a hairdryer in the bathtub.[15]  (*Id.* at 670).  She also reported posttraumatic recollections of abuse growing up, which cause withdrawal and depression.  (*Id.*)  Dr. Flexman did not note any obsessive/compulsive tendencies or delusional thinking.  (*Id.*)  Further, Plaintiff denied excessive worry and concerns.  (*Id.*)

Dr. Flexman noted that Plaintiff's mood was fair, her intellectual functioning was average, memory was fair, and immediate attention span was good.  (*Id.*)  He also opined that Plaintiff's effort was fair and that the reliability of the evaluation was fair.  (*Id.*)

Dr. Flexman opined that Plaintiff "was not able to acknowledge the presence of psychological issues in her life … [and] does not have a realistic degree of recognition for the amount that her impairment has on her ability to function."  (*Id.* at 671).  However, he also states that Plaintiff "is able to recognize her psychological problems and her ability to manage her daily activities is good, as is her ability to make reasonable life decisions."  (*Id.*)  He further noted that Plaintiff is able to handle her own finances and her judgment for ordinary daily affair appears fair.  (*Id.*)

---

[15] This reported suicide attempt appears to be the same as that previously reported to Ms. Kramer as having occurred in 2011.

Dr. Flexman's diagnostic impressions included noting alcohol abuse, cannabis abuse, major depression recurrent, post-traumatic stress chronic, mild severity of psychosocial stressors, and a GAF score of 60.

Finally, Dr. Flexman provided a functional assessment, which he stated was applicable to a thirty to forty hour work week. (Id. at 671-72). Dr. Flexman did not note any difficulty in Plaintiff's ability to understand, remember, and carry out instructions. Indeed, he wrote that she was able to locate the office without needing assistance, and was able to follow various instructions with only one command. (Id. at 672). He judged her intellectual level to be minimally within the average range. (*Id.*) Further, Dr. Flexman found no issue with Plaintiff's ability to maintain attention and concentration, as well as persistence and pace in performing both simple and multi-step tasks. (*Id.*) He stated that she was able to maintain focus and attention throughout the entirety of the sixty to ninety minute evaluation process, without appearing distracted. (*Id.*) Further, Plaintiff's work history did not reveal any difficulty in maintaining focus and attention on previous jobs. (*Id.*)

Dr. Flexman further stated that Plaintiff was cordial with him during the interview and assessment, and that her previous work relationships indicate her ability to get along with coworkers. (*Id.*) Further, her reported relationship with supervisors was appropriate and she had no history of job termination due to relationship problems. (*Id.*) Dr. Flexman opined that "[c]urrent psychiatric issues suggest that the claimant may not have problems in relation to others in the workplace." (*Id.*) Additionally, he stated that Plaintiff's "[p]ast mental health history would not indicate problems with work pressure."

13

(*Id.*) Further, he opined that Plaintiff's daily living stresses did not appear to significantly affect work pressures, and that her ability to adjust to new tasks would not require significant support. (*Id.*) Dr. Flexman specifically noted that "[w]ork pressures would not be expected to significantly increase psychological problems." (*Id.*)

### c. Caroline Lewin, Ph.D.

On June 27, 2012, BDD reviewing psychologist, Caroline Lewin, Ph.D., conducted a review on reconsideration of the medical evidence. (Doc. 6, PageID ## 141-52). Specifically, Dr. Lewin opined that Plaintiff had neither understanding or memory limitations, nor sustained concentration or persistence limitations. (*Id.* at 137).

However, Dr. Lewin did note that Plaintiff had social interaction and adaptation limitations. (*Id.*) As to "social interaction limitations," Dr. Lewin opined that there was "[n]o evidence of limitation" with regard to Plaintiff's ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; that Plaintiff was "not significantly limited" in her ability to interact appropriately with the general public, ask simple questions or request assistance, or accept instructions and respond appropriately to criticism from supervisors; and that Plaintiff was "moderately limited" in her ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. (*Id.*) When asked to explain her opinion as to "social interaction limitations," Dr. Lewin wrote: "One arrest for domestic violence, injuries from 'wrestling' with fiancé. Cooperative with others." (*Id.*)

As to "adaptation limitations," Dr. Lewin opined that Plaintiff was "moderately limited" in her ability to respond appropriately to changes in the work setting, and to be

14

aware of normal hazards and take appropriate precautions; and was "markedly limited" in her ability to travel in unfamiliar places or use public transportation, and to set realistic goals or make plans independently of others. (*Id.* at 138). Dr. Lewin provided the following explanation for her opinions regarding Plaintiff's "adaptation limitations": "Multiple admits for depression and suicide ideation. None appear to be work related but she will function best with only superficial contacts with others." (*Id.*)

In closing, Dr. Lewin provided the following "Additional Explanation" regarding Plaintiff's mental RFC assessment: "[Claimant] has multiple admits for depression and suicide ideation. However she has been taking her meds as prescribed, following treatment, and now reports sobriety." (*Id.*) Finally, Dr. Lewin noted that no other medical source offered an opinion regarding Plaintiff's limitations that was more restrictive than her own. (*Id.*)

### B. The Administrative Hearing

#### 1. *Plaintiff's Testimony*

At the hearing, Plaintiff testified that she was living with her fiancé and that she had two children from a prior relationship, though she did not have custody of them. (Doc. 6, PageID # 98). She stated that she has no difficulties with driving and has a valid driver's license. (Id. at 99). Plaintiff testified that she was "bi-polar, diabetic, and depressed." (*Id.*) She further stated that she was not physically limited in her ability to stand or walk and could comfortably lift about twenty pounds. (*Id.* at 100).

Plaintiff testified that her fiancé does all the cooking, that she does not go to the grocery store, and that she does not go out to eat. (*Id.*) Plaintiff stated that the only time

she leaves the house is to walk her dog. (*Id.*)  She also stated that she smokes half a pack of cigarettes per day.  (*Id.*)  Plaintiff testified that on a typical day, she wakes up at eight in the morning and walks her dog.  (*Id.* at 101).  She then watches television and reads. (*Id.*)

Plaintiff stated that her depression began around 1992 when she was first diagnosed with diabetes.  (*Id.*)  Plaintiff also confirmed that there is a history of depression in her family and that her father committed suicide several years prior.  (*Id.*)  She stated that she had drug and alcohol problems up until a year and a half prior to the hearing.  (*Id.* at 104).  Plaintiff testified that she only recently started therapy and that she has already been to three facilities.  (*Id.* at 102).  She also stated that psychiatrist, Dr. Kenneth Glass, currently prescribes medication for her.  (*Id.*)  Plaintiff testified that she suffers from mood swings, wherein she is fine one moment and in tears the next.  (*Id.*)  She also stated that she often feels like she wants to be isolated, that she only sleeps off and on throughout the night, and that she does not have a big appetite.  (*Id.* at 103).  Plaintiff also stated that she only has one friend and only speaks to him via text, infrequently.  (*Id.* at 104).  Plaintiff testified that she has trouble with her memory and concentration.  (*Id.*)

### 2. *The VE's Testimony*

Vocational expert, Suman Srinivasan, responded to hypotheticals posed by both the ALJ and Plaintiff's counsel.  (*Id.* at 105).  In response to the ALJ, the VE testified that there were jobs in the national and regional economy, which could be performed by an individual of Plaintiff's age, education, and work experience, who is limited to light,

unskilled work with only occasional personal contact in the workplace and no production quotas.  (*Id.* at 106).

In response to Plaintiff's counsel, the VE testified that an individual suffering from psychological symptoms, who is unable to maintain attention and concentration, and who could be off task as often as a third of the work day, would not be able to maintain full-time work at any exertional level.  (*Id.* at 107).  Additionally, in response to Plaintiff's counsel, the VE testified that an individual suffering from psychological symptoms, who has difficulty maintaining attendance and could be absent at least three times a month, would not be able to maintain full-time work at any exertional level.  (*Id.*)

### C.  The ALJ's Decision

The ALJ provided a thorough summary of Plaintiff's treating, examining, and non-examining source opinions, whether or not they qualified as "acceptable medical sources," as defined by the regulations.  (Doc. 6, PageID ## 78-86).  With regard to mental impairments, the ALJ gave significant weight to the findings of the BDD consultative and reviewing psychologists, with greatest weight to the assessment of consultative psychologist, Dr. Flexman.  (*Id.* at 85).

## IV.  ANALYSIS

### A.  The ALJ Did Not Err in Weighing Medical Source Opinions

"Regardless of its source, [the ALJ must] evaluate every medical opinion [he] receive[s]," in order to determine whether a claimant is disabled.  20 C.F.R. § 404.1527(b), (c).  However, "not all medical sources need be treated equally."  *Brooks v. Comm'r of Soc. Sec.*, 531 F. App'x 636, 642 (6th Cir. 2013) (internal quotation marks

and citations omitted).  The Regulations require that a treating source's medical opinion

be given "controlling weight" as long as it is "well-supported" by objective evidence and

is "not inconsistent with the other substantial evidence."  20 C.F.R. § 404.1527(c)(2).

Greater weight is generally given to treating source opinions because they can provide a

detailed, longitudinal picture of a claimant's medical impairments and may bring a

unique perspective to the medical evidence that cannot be obtained from reports of

individual examinations or from the objective findings alone.  *Id.*  Less weight is given to

medical opinions provided by non-treating and, certainly, non-examining sources.  *Id.*

However, '[i]t is an error to give an opinion controlling weight simply because it

is the opinion of a treating source if it is not well-supported by medically acceptable

clinical and laboratory diagnostic techniques or if it is inconsistent with the other

substantial evidence in the case record.'"  *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399,

406 (6th Cir. 2009) (quoting Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *2 (July 2,

1996)).  "If the opinion of a treating source is not accorded controlling weight, an ALJ

must apply certain factors – namely, the length of the treatment relationship and the

frequency of examination, the nature and extent of the treatment relationship, the

supportability of the opinion, consistency of the opinion with the record as a whole, and

the specialization of the treating source – in determining what weight to give the

opinion."  *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (discussing

20 C.F.R. § 1527(d)(2)).

If, upon consideration of the § 1527 factors, the ALJ rejects the opinion of a

treating physician, she must articulate "good reasons" for doing so.  *Wilson*, 378 F.3d at

18

544.  "The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases … [but] also ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule."  *Id.* at 544-45 (internal quotation marks and citations omitted).  In particular, the ALJ's decision must articulate the "specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight."  Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *5 (July 2, 1996).  Notably, the ALJ's duty to properly articulate 'good reasons' is so significant that, "failure to follow the procedural requirement of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight accorded the opinions denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record."  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 243 (6th Cir. 2007).

### 1.  *Acceptable Medical Source Opinions*

Plaintiff argues that the ALJ "failed to give appropriate weight to the treating source," in contravention of the Social Security Administration's ("SSA") regulatory requirements and Sixth Circuit case law.  (Doc. 8 at 11).

As an initial matter, the designation of "acceptable medical source" applies limitedly to: (1) licensed physicians; (2) licensed or certified psychologists; (3) licensed optometrists; (4) licensed podiatrists; and (5) qualified speech-language pathologists.  20 C.F.R. § 404.1513(a)(1)-(5).  Treating, non-treating, and non-examining sources may all

qualify as "acceptable medical sources," if they fit within one of the five § 404.1513(a) categories.  20 C.F.R. § 404.1502.  However, health care providers who are not listed under § 404.1513(a), such as nurse practitioners, physicians' assistants, licensed clinical social workers, *etc.*, do not qualify as "acceptable medical sources," and are instead considered "other medical sources."  20 C.F.R. § 404.1513(d).

The distinction between "acceptable" and "other" medical sources is critical for three reasons.  Soc. Sec. Rul. 06-03p, 2006 WL 2329939, at *2.  First, "only '*acceptable medical sources*' can be considered *treating* sources, as defined in 20 CFR 404.1502 and 416.902, whose medical opinions may be entitled to controlling weight."  SSR 06-03p, 2006 WL 2329939, at *2 (emphasis added).  Second, "only 'acceptable medical sources' can give [] medical opinions."  *Id.*  Third, only evidence from an "acceptable medical source" can be used to establish the existence of a medically determinable impairment. *Id.*

Regardless, the SSA recognizes that "[o]pinions from [other] medical sources, who are not technically deemed 'acceptable medical sources' … are important and <u>should be evaluated on key issues such as impairment severity and functional effects</u>, along with the other relevant evidence in the file."  SSR 06-03p, at *4 (emphasis added).[16] Therefore, the ALJ "will always consider the medical opinions in [the] case record

---

[16] *See also* 20 C.F.R. § 404.1513(d) ("In addition to evidence from the acceptable medical sources…, [the ALJ] may also use evidence from other sources to show the severity of [the claimant's] impairment(s) and how it affects [her] ability to work").

together with the rest of the relevant evidence."  20 C.F.R. § 404.1527(b).  Notably, the

Rulings advise that:

> [D]epending on the particular facts in a case, and after applying the factors
> for weighing opinion evidence, an opinion from a medical source who is
> not an "acceptable medical source," may outweigh the opinion of an
> "acceptable medical source," including  the medical opinion of a treating
> source.  For example, it may be appropriate to give more weight to the
> opinion of a medical source who is not an "acceptable medical source" if he
> or she has seen the individual more often than the treating source and has
> provided better supporting evidence and a better explanation for his or her
> opinion.

SSR 06-03p, 2006 WL 2329939, at *5.

Ultimately, the ALJ has the discretion to determine what weight to accord "other

source" opinions.  *See, e.g.*, *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 541 (6th Cir.

2007); *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 530 (6th Cir. 1997).  The same

factors used to evaluate acceptable medical sources under 20 C.F.R. § 404.1527(d) also

apply in evaluating opinions from "other medical sources."  SSR 06-03p, 2006 WL

2329939, at *5.  Those factors include: (1) "[h]ow long the source has known and how

frequently the source has seen the individual"; (2) "[h]ow consistent the opinion is with

other evidence"; (3) "[t]he degree to which the source presents relevant evidence to

support an opinion"; (4) "[h]ow well the source explains the opinion"; (5) "[w]hether the

source has a specialty or area of expertise related to the individual's impairment(s)"; and

(6) "[a]ny other factors that tend to support or refute the opinion."  *Id.*

Although "[a]n ALJ must consider other-source opinions and generally should

explain the weight given to opinions for these 'other sources … other-source opinions are

not entitled to any special deference."  *Hill v. Comm'r of Soc. Sec.*, 560 F. App'x 547,

21

549 (6th Cir. 2014) (internal quotation marks and citations omitted); SSR 06-03p, 2006

WL 2329939, at *6.  Furthermore, because "other medical sources" are not considered

"treating sources," their opinions are not subject to the 'reason-giving' requirement of the

treating physician rule.  *See, e.g.*, *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 876 (6th

Cir. 2007); *Borden v. Comm'r of Soc. Sec.*, 2014 WL 7335176, at *9 (N.D. Ohio Dec. 19,

2014).

Here, Plaintiff argues that "[t]he ALJ erred in giving deference to the opinions of

Dr. Flexman, the one-time consulting State agency [] psychologist and the State agency

reviewers over the opinion of Ms. Kramer" while "reject[ing] Ms. Kramer's opinion

because she was not an acceptable medical source."  (Doc. 8 at 11).  Specifically,

Plaintiff asserts that, in affording greater weight to evaluating and non-examining source

opinions, the ALJ failed to consider the treating relationship, and the consistency and

duration of Plaintiff's contact with Ms. Kramer, as opposed to her minimal (or non-

existent) contact with the evaluating and non-examining sources.  (Doc. 8 at 12-13).

While Plaintiff appears to acknowledge that Ms. Kramer, a licensed independent

social worker, is not an "acceptable medical source," she erroneously categorizes Ms.

Kramer as a "treating source."  (*Id.* at 11).   To be clear, licensed independent social

workers are not "acceptable medical sources," but are instead considered to be "other

medical sources."  *See* SSR 06-03p, 2006 WL 2329939, at *2; *Payne v. Comm'r of Soc.

Sec.*, 402 F. App'x 109, 118 (6th Cir. 2010).  As previously stated, only an "acceptable

medical source" can be a "treating source."  SSR 06-03p, 2006 WL 2329939, at *2.

Thus, Ms. Kramer is <u>not</u> a "treating source."  Accordingly, Ms. Kramer's opinion, while

entitled to *consideration*, does not qualify as a "medical opinion" as defined under 20

C.F.R. § 404.1527(a)(2), is not due any special deference, is not entitled to controlling

weight, cannot establish the existence of a medically determinable impairment, and is not

subject to the 'reason-giving' requirement under the treating source rule.  *See supra.*  In

that regard, Plaintiff's argument that the ALJ failed to give appropriate weight to Ms.

Kramer as a "treating source," is erroneous and therefore unavailing.

However, as previously stated, "other medical source" opinions, though not due

any special deference, are still entitled to consideration under the same factors as

"acceptable medical sources."  And, here, the ALJ did consider Ms. Kramer's opinion

under the appropriate criteria.  Specifically, the ALJ identified Ms. Kramer as Plaintiff's

therapist, and acknowledged her opinion that Plaintiff: experienced marked difficulties in

social functioning, concentration, persistence, and pace; had marked episodes of

decompensation; and that Plaintiff would likely miss work at least three times per month

due to her impairments and treatment.  (Doc. 6, PageID # 85).  However, the ALJ wrote

that:

> Ms. Kramer is not an "acceptable medical source" pursuant to 20 CFR
> 404.1513 and 416.913.  However, even when considering her opinion under
> the criteria set forth in SSR 06-03p, which essentially parallel the criteria
> for giving deferential weight to medical source opinions, the undersigned
> gives little weight to her assessment, because it is unsupported by objective
> signs and findings in the record.  As discussed above, the mental health
> treatment notes generally show no more than moderate findings.  Many
> notes document the claimant's subjective complaints and concerns about
> financial resources, but they do not support a finding of marked limitation
> in any functional area.  Ms. Kramer's opinion that the claimant would
> likely miss several days of work per month is also speculative and
> unsupported by objective evidence.  Moreover, the claimant described a
> relatively wide range of daily activities, which is inconsistent with a finding

23

of disability.  No "acceptable" treating mental health source has provided an opinion to the contrary that the claimant is "disabled" or more limited than set forth above.

*Id.*

Admittedly, the ALJ *cited*, but did not specifically *list*, each of the factors for evaluating "other medical source" opinions.  However, such specificity is not required and, therefore, its absence does not constitute error—particularly as Ms. Kramer was not an "acceptable medical source."  *See, e.g.*, *Gill v. Comm'r of Soc. Sec.*, 2015 WL 8773885, at *9 (N.D. Ohio Dec. 15, 2015) ("[t]he requirement that an ALJ consider and explain the weight ascribed to an "other source" is not a demanding standard") (collecting cases).  Indeed, even in the case of treating sources, to whom the 'reason-giving' requirements apply, "the regulations … expressly require only that the ALJ's decision include good reasons for the weight given to the treating source's opinion—not a factor-by-factor analysis."  *Francis v. Comm'r of Soc. Sec.*, 414 F. App'x 802, 804 (6th Cir. 2011) (internal quotation marks and citations omitted).

Here, the ALJ sufficiently articulated a basis for discrediting Ms. Kramer's opinion.  (Doc. 6, PageID # 85).  Specifically, after having thoroughly summarized the record evidence, including the "other medical source" opinions at issue, the ALJ noted that Ms. Kramer's opinions are inconsistent, speculative, and unsupported by objective evidence.  (*Id.*)  The ALJ also specified that the "[p]rogress notes dated through June 2013 primarily document [Plaintiff's] subjective complaints of situational stressors, which included financial concerns."  (*Id.* at 82).

The ALJ thoroughly summarized the medical evidence, stated that he considered the appropriate factors, and determined that the "other medical source" opinion of Ms. Kramer is inconsistent with the record.  His findings are supported by substantial evidence and, further his decision to refrain from a factor-by-factor analysis does not constitute error.

### 2.  The RFC Determination[17]

Plaintiff also argues that "the ALJ's RFC limitations of unskilled work with no more than occasional personal contacts and no production quotas do not take into consideration the more severe restrictions found by [BDD reviewing source, Dr. Caroline] Lewin."  (Doc. 8 at 14).  Plaintiff believes that the ALJ substituted his own judgment for the medical source opinions and therefore argues that the ALJ's findings are not supported by substantial evidence.  (*Id.* at 15).

Of note here is that the ALJ neither disregarded, nor significantly discredited Dr. Lewin's opinion.  Indeed, he stated that he "essentially adopted the findings of the BDD consultative and reviewing psychologists," and gave "significant weight to their assessments."  (Doc. 6, PageID # 85).  Moreover, the ALJ's RFC determination – which limited Plaintiff to light, unskilled work, with no more than occasional personal contacts in the workplace and no production quotas – largely  incorporated, and even exceeded, the level of impairment found by Dr. Lewin.  (*Id.* at 79, 85).  The ALJ did, however,

---

[17] The RFC determination is an administrative finding of fact reserved to the Commissioner.  20 C.F.R. § 404.1527(d)(2), (3).

choose to assign greater weight to the opinion of examining psychologist, Dr. Flexman, than reviewing psychologist, Dr. Lewin.  (*Id.* at 85).  Specifically, the ALJ noted that:

> [Dr. Flexman's] assessment is supported by objective signs and findings upon examination and in the preponderance of the medical record.  His assessment is also consistent with the mental health progress notes in the record, which generally show no more than moderate findings and good response to medication and treatment.  The [RFC] limitations above for unskilled work with no more than occasional personal contacts and no production quotas adequately account for the claimant's moderate limitation in social functioning and in concentration, persistence, and pace.  The record does not show the marked level of impairment as suggest by the most recent BDD reviewing psychologist[, Dr. Lewin].

(*Id.*)

Plaintiff's argument that the ALJ's findings are based on a substitution of his own opinions for that of Plaintiff's medical sources is entirely without merit.  As shown above, the ALJ's decision to discredit part of Dr. Lewin's opinion was not based on his own speculative medical judgment, but rather his reliance on Dr. Flexman's opinion, which the ALJ found to be more consistent with the record evidence.  Moreover, contrary to Plaintiff's argument, the ALJ did not *fail to consider* Dr. Lewin's opinion regarding marked impairments.  Rather, the ALJ considered, but ultimately found that Dr. Lewin's assessment of severity – in certain respects – overstated Plaintiff's limitations, as findings of marked impairments were inconsistent and unsupported by the record.  And, having appropriately discredited those findings, the ALJ did not err in not incorporating them into the RFC determination.  *See Smith*, 482 F.3d at 877.

Plaintiff also argues that the ALJ relied on only those facts in the record that supported a 'not disabled' determination, particularly as it related to Plaintiff's GAF score. (Doc. 8 at 15-19).

"A GAF score is a subjective rating of an individual's overall psychological functioning, which may assist an ALJ in assessing a claimant's mental RFC." *Miller v. Comm'r of Soc. Sec.*, --- F.3d ----, 2016 WL 362423, at *7 (6th Cir. Jan. 29, 2016) (internal quotation marks and citations omitted). "While a GAF score may be of considerable help to the ALJ in formulating the RFC, it is not essential to the RFC's accuracy." *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 241 (6th Cir. 2002). Indeed, "GAF scores are 'not raw medical data,' and 'the Commissioner has declined to endorse the [GAF] score for use in' Social Security benefits programs." *Miller*, 2016 WL 362423, at *7 (quoting *Lee v. Comm'r of Soc. Sec.*, 529 F. App'x 706, 716 (6th Cir. 2013). "If other substantial evidence (such as the extent of the claimant's daily activities) supports the conclusion that she is not disabled, the court may not disturb the denial of benefits to a claimant [because her] GAF score is [] low." *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 511 (6th Cir. 2006). Ultimately, the value of a claimant's GAF score must be determined on a case-by-case basis. *Miller*, 2016 WL 362423, at *7.

Here, there is no basis for Plaintiff's assertion that the ALJ only relied upon facts that supported a 'not disabled' determination. Specifically, Plaintiff's contention that the ALJ was "picking and choosing only the GAFs which support his opinion," is patently false. (Doc. 8 at 16). Indeed, the ALJ considered the lower GAF scores, stating "[a]lthough some of the claimant's GAF scores in the record are at 50 or below (Exhibits

8F, pages 11, 15, 18; 11F, pages 40 and 56; and 13F, page 1), the undersigned gives little weight to these scores." (Doc. 6, PageID # 86).  The ALJ explained that the lower GAF scores were largely "provided upon [Plaintiff's] initial admission to treatment, prior to her being prescribed psychiatric medication, when [Plaintiff] had not been taking her medications, or when she had been using drugs or alcohol." (*Id.*)  Moreover, the ALJ recognized that the GAF scores are subjective, and merely noted that the higher scores appear more consistent with the evidence in the record and the preponderance of the examination findings from Plaintiff's medical sources.  (*Id.*)

Plaintiff also argues that the ALJ failed to consider the combined effect of her stress on her diabetes.  "But an ALJ's individual discussion of multiple impairments does not imply that [he] failed to consider the effect of the impairments in combination, where the ALJ specifically refers to a 'combination of impairments' in [his findings]." *Hill*, 560 F. App'x at 551 (internal quotation marks and citations omitted).  Here, the ALJ specifically assessed "[t]he severity of [Plaintiff's] impairments, considered singly and in combination," in determining whether she meets the listings, and further stated that his RFC determination was made "[a]fter careful consideration of the entire record," and having "considered all symptoms."  (Doc. 6, PageID ## 78-79).  In short, the fact that the ALJ did not expressly note the effect of stress on Plaintiff's diabetes does not evidence a failure to consider the combined effect of her impairments.

The ALJ's RFC determination is supported by substantial evidence and should therefore be affirmed.

### 3. *Daily Activities*

Plaintiff alleges that the ALJ relied on a "mischaracterization" of her daily activities to discredit Ms. Kramer's opinions and to find that Plaintiff was not disabled. (Doc. 8 at 19-20). Plaintiff argues that the ALJ erred in relying on Dr. Flexman's report of her daily activities. (Id. at 19). Moreover, Plaintiff states that her ability to engage in certain daily activities does not constitute a 'good reason' to discredit a treating source opinion, and claims that her admitted daily activities do not amount to an ability to perform work on a "regular and continuing basis." (*Id.* at 19-20).

As an initial matter, this Court reiterates the fact that Ms. Kramer is not a treating source and, therefore, her opinion does not qualify as a "medical opinion" as defined under 20 C.F.R. § 404.1527(a)(2), is not due any special deference, is not entitled to controlling weight, cannot establish the existence of a medically determinable impairment, and is not subject to the 'reason-giving' requirement under the treating source rule. *See supra.* Thus, to the extent that Plaintiff relies upon an erroneous characterization of Ms. Kramer as a treating source, her argument fails as a matter of law.

Additionally, the ALJ did not err in relying on Dr. Flexman's evaluation of Plaintiff's daily activities, because his evaluation was a summary of the daily activities that she reported. (*See* Doc. 6, PageID ##668-69). Moreover, the ALJ did not merely rely on Plaintiff's daily activities as set forth in Dr. Flexman's evaluation. Indeed, the ALJ cited to numerous sources, as well as Plaintiff's own testimony, in assessing Plaintiff's daily activities. (*Id.* at 80, 83).

Finally, Plaintiff's argument that her admitted daily activities do not amount to an ability to perform work on a "regular and continuing basis" is unavailing. The "RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." Soc. Sec. Rul. 96-8p, 1996 WL 374184, at *1 (emphasis added). The term "'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." *Id.* Notably, minimal daily functions (*e.g.*, driving, reading, cleaning, watching television, *etc.*) are not comparable to typical work activities. *See, e.g., Rogers,* 486 F.3d at 248-49. However, with that said, daily activities *are* an appropriate consideration to show that a claimant's symptoms are not as limiting as alleged. 20 C.F.R. §§ 404.1529(c)(3)(i), 416.929(c)(2)(i); *see Blacha v. Sec'y of Health & Human Servs.*, 927 F.2d 228, 231 (6th Cir. 1990) (an ALJ may "consider household and social activities engaged in by the claimant in evaluating a claimant's assertions of pain or ailments").

First, Plaintiff's daily activities are far from 'minimal daily functions' and are, in fact, quite intensive. Further, the fact that Plaintiff appeared at the hearing and testified that she leads a sedentary life does not mean that the ALJ was bound to accept those statements as true. In making a determination of disability, "an ALJ is not required to accept a claimant's subjective complaints and may properly consider [the claimant's] credibility." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003).[18] The Court must "accord the ALJ's determination of credibility great weight and deference

---

[18] Subjective complaints may "support a claim for disability, if there is also objective medical evidence of an underlying medical condition in the record." *Jones*, 336 F.3d at 475-76.

particularly since the ALJ has the opportunity … of observing [the claimant's] demeanor while testifying." *Id*. "Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among medical reports, claimant's testimony, and other evidence." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997) (citations omitted).

In sum, the ALJ did not rely on Plaintiff's statements regarding her daily activities as substantial evidence that Plaintiff is not disabled.  Instead, the ALJ considered Plaintiff's admitted daily activities in determining the credibility of her allegations of severity and her physicians' opinions regarding physical limitations.  In doing so, the ALJ found that the level of severity Plaintiff alleged was inconsistent with her daily activities, which she herself reported to various sources over time.  Such consideration of daily activities for purposes of evaluating symptoms is appropriate and, accordingly, the ALJ did not err in her assessment.  *See* 20 C.F.R. §§ 404.1529(c)(3)(i) and 416.929(c)(2)(i).

Accordingly, this Court finds no error in the ALJ's consideration of the medical evidence and, indeed, concludes that the ALJ engaged in a thorough analysis, in line with the SSA's rules and regulations.

## V.  CONCLUSION

Based upon the foregoing, the Court believes that there is substantial evidence supporting the ALJ's findings at each step of the sequential evaluation, including her ultimate decision that Plaintiff was not disabled under the Act.

**IT IS THEREFORE RECOMMENDED THAT:**

1.  The Commissioner's non-disability finding be AFFIRMED;

2.  The case be terminated on the docket of this Court.

Date: 2/16/2016                           *s/ Sharon L. Ovington*

                                          Sharon L. Ovington
                                          Chief United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within **FOURTEEN** days after being served with this Report and Recommendations.  Pursuant to Fed. R. Civ. P. 6(d), this period is extended to **SEVENTEEN** days if this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F).  Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.  If the Report and Recommendation is based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections within **FOURTEEN** days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981).